# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-10266

United States Court of Appeals
Fifth Circuit

**FILED**

September 11, 2014

Lyle W. Cayce
Clerk

RALPH S. JANVEY,

Plaintiff – Appellee

v.

JAMES BROWN; ROBERT BUSH; GENE CAUSEY; JOSEPH CHUSTZ; DARRELL COURVILLE; ET AL; THOMAS H. TURNER; TARRAL E. DAIGLE; JEFF P. PURPERA, JR.; DANIEL JOSEPH DAIGLE; JILDA ANN DAIGLE; ROBERT S. GREER; ALICE D. GREER; GMAG, L.L.C.; GARY D. MAGNESS IRREVOCABLE TRUST; GARY D. MAGNESS; MAGNESS SECURITIES, L.L.C.; DAVID TOPP; DORA TOPP; RISIA TOPP WINE; HENRY A. MENTZ, III,

Defendants – Appellants

------------------------------------------------
Consolidated with 13-10272

RALPH S. JANVEY, In his capacity as Court-Appointed Receiver for the Stanford International Bank, LTD et al,

Plaintiff - Appellee

v.

JAMES D. HOLDEN; HENRIETTA M. HOLDEN; BETTY JO FORSHAG; JUDY PALMISANO JONES; WILLIAM L. LAFUZE, ENRIQUE PAREDES; MARIANNE PAREDES; EQUUS VIII, L.L.C.; MOORE, MOORE AND MOORE, L.L.C.; NAMDA INVESTMENT GROUP, L.L.C.; ESTATE OF NATHAN ALLEN MOORE; SOCOCO L.T.D.A.; EDUARDO NAJERA; JENNIFER NAJERA; MICHAEL E. STAID,

Defendants – Appellants

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

------------------------------------------------
Consolidated with 13-10276


RECEIVER RALPH S. JANVEY,

Plaintiff – Appellee

v.

SARTIN LIVING TRUST 1994; RAFAEL BERMUDEZ; GERALD W.
TONNER; MARY E. TONNER,

Defendants – Appellants


------------------------------------------------
Consolidated with 13-10279


RECEIVER RALPH S. JANVEY,

Plaintiff – Appellee

v.

EDWARD S. RUBIN ESTATE AND ROBERT RUBIN,

Defendant – Appellant

_____

Appeals from the United States District Court
for the Northern District of Texas
_____

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

2

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

In this Texas Uniform Fraudulent Transfer Act ("TUFTA") case, plaintiff-appellee Ralph S. Janvey, the Receiver for the Stanford entities, seeks to recover funds that were paid to defendants-appellants, purchasers of certificate of deposits from Stanford International Bank, Ltd., as part of a Ponzi scheme. The district court granted the Receiver's motion for summary judgment, ordering defendants-appellants to return funds paid in excess of their original investments. Defendants-appellants timely appeal. We AFFIRM.

## I

This case stems from the Stanford Ponzi scheme.[1] The Stanford Ponzi scheme has been the subject of numerous appeals, and the pertinent facts of this scheme are well-established. We recount briefly these relevant facts.

R. Allen Stanford created and owned a network of entities (the "Stanford entities") that sold certificates of deposit ("CDs") to investors through the Stanford International Bank, Ltd. ("SIB").[2] These CDs promised investors extraordinarily high rates of return. Using the Stanford entities, Stanford and his employees would explain to "prospective investors that their funds would be reinvested in high-quality securities so as to yield the investors the high rates of return purportedly guaranteed by the CDs."[3] But, instead of actually investing the money raised by selling these CDs, Stanford used the money to pay prior investors their promised returns. By paying the prior investors these

---

[1] "A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185,188 n.1 (5th Cir. 2013) (quoting *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008)) [hereinafter *DSCC*].

[2] *See generally id.* at 188, 198.

[3] *Id.*

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

returns, Stanford, and the Stanford entities, developed credibility and a track record of supposed success, which in turn allowed them to recruit additional investors.[4]

Although it is unclear for how long the Stanford Ponzi scheme operated, the Receiver's expert witness, Karyl Van Tassel, a certified public accountant, examined the Stanford entities' books, interviewed prior employees, examined investors' and institutions' records, and considered the guilty plea and arraignment statement of Stanford's Chief Financial Officer, James M. Davis, to conclude (i) that the scheme "began and was insolvent as early as 1999," and (ii) that the scheme operated continuously until October 2008.[5]  When the scheme collapsed in early 2009, the Stanford entities had raised over $7 billion from sales of fraudulent CDs.[6]

Stanford and Davis were convicted of numerous federal offenses, and are currently serving federal prison sentences.[7]  The Securities and Exchange Commission brought a civil suit against Stanford, his agents, and the Stanford entities, alleging violations of federal securities laws.  At the SEC's request, the district court appointed Ralph S. Janvey (the "Receiver") as receiver over the Stanford entities, and charged him with preserving corporate resources and recovering corporate assets that had been transferred in fraudulent conveyances.[8]

In following this charge, the Receiver has filed numerous fraudulent transfer claims against investors who profited from the Stanford Ponzi scheme.

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.* at 188-89.
[8] *Id.*

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

Although the vast majority of investors lost their entire investment, some investors profited, as they had withdrawn their investments prior to the collapse of the scheme. The Receiver now seeks disgorgement of these profits, as he alleges that these are fictitious profits that are in fact funds taken from other investors.

The defendants-appellants ("investor-defendants") in this appeal are all investors who received back their principal, as well as supposed interest on this principal. In other words, as described by the district court and the Receiver, they are 'net winners' in the Ponzi scheme. Except for one investor-defendant that we address below, it is undisputed that the investor-defendants at issue here were 'net winners.'

The Receiver moved for partial summary judgment on the TUFTA claims at issue here, arguing that the payments made to the investor-defendants were fraudulent transfers and that no affirmative defenses are available to the defendants, as the payments were not made in exchange for reasonably equivalent value. The district court granted the motion for partial summary judgment, and the investor-defendants timely filed for leave to interlocutory appeal, which this court granted.

On appeal, the investor-defendants argue (i) that the district court erred in holding that TUFTA governed the Receiver's claims; (ii) that the district court erred in holding that the Receiver has standing under TUFTA to bring these claims; (iii) that the TUFTA claims are untimely; (iv) that the district court erred in holding that payments to the investor-defendants were fraudulent transfers made without an exchange for reasonably equivalent value; (v) that the investor-defendants' assets in Individual Retirement Accounts ("IRAs") are exempted from TUFTA; and, (vi) that fact issues remain

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

as to whether certain investor-defendants are in fact 'net winners.' We address each issue in turn.

## II

Our analysis begins with the choice of law question. "We conduct a de novo review of choice-of-law issues[.]"[9] It is well-settled that choice of law issues for supplemental state law claims, such as the fraudulent transfer claims at issue here, are governed by the forum state in which the federal court is sitting.[10] Here, the forum state is Texas, and "Texas courts follow the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws[.]"[11]

The district court, applying Texas choice-of-law rules, concluded that TUFTA governed the Receiver's fraudulent transfer claims. The district court first determined that Texas state courts first conduct a 'false conflict' analysis, and would then only apply the Second Restatement's most significant relationship test where a true conflict exists.[12] Here, the district court

---

[9] *Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 175 (5th Cir. 2007) (citing *R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 221–22 (5th Cir. 2005)).

[10] *See Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941); *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989) ("A federal court exercising pendent jurisdiction over state law claims, must apply the substantive law of the state in which it sits."); *see also Warfield v. Carnie*, No. 3:04-CV-633, 2007 WL 1112591, at *7 (N.D. Tex. Apr. 13, 2007) ("[T]he Court recognizes that it has supplemental jurisdiction over the Receiver's pendent state law claims under the Uniform Fraudulent Transfer Act and for unjust enrichment. A federal court exercising pendent jurisdiction over state law claims must apply the substantive law of the state in which it sits.") (internal citation omitted); *Terry v. June*, 420 F. Supp. 2d 493, 500-02 (W.D. Va. 2006) (in federal receiver context, state Uniform Fraudulent Transfer Act claims treated as pendent state law claims subject to *Klaxon* choice of law analysis).

[11] *Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n.*, 624 F.3d 185, 190 (5th Cir. 2010) (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000)).

[12] *Janvey v. Alguire*, Nos. 3:09–CV–0724–N, 3:10–CV–0366–N, 3:10–CV–0415–N, 3:10–CV–0478–N, 3:10–CV–0528–N, 3:10–CV–0617–N, 3:10–CV–0725–N, 3:10–CV–0844–

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

concluded that any conflict between the law of Texas, the center of the Ponzi scheme, and the law of Antigua, SIB's place of incorporation, was a 'false conflict,' because Antigua "has no actual interest in this dispute."[13]    Finally, the district court explained, as between Texas and other UFTA-enacting states, there is no conflict, because these states "have identical language in their fraudulent transfer provision, and that language is 'virtually identical' to the corresponding language in the Bankruptcy Code."[14]    Thus, the district court concluded that "because there is no conflict of laws between UFTA-enacting states as relating to the instant motions, the Court need not undertake a choice-of-law analysis as between those states."[15]

The investor-defendants argue that the district court's choice of law analysis was fundamentally flawed.  They argue that the district court first erred in conducting a 'false conflicts' analysis, thereby displacing the Second Restatement test for resolving a conflict of laws.  And they argue that, even if the district court was correct in engaging in a 'false conflicts' analysis, the district court erred in concluding that there was a false conflict.  They next argue that the district court erred in ignoring SIB's separate corporate existence, and whether the corporate form should be ignored was a question of Antiguan law.  Finally, they argue that a Second Restatement analysis compels the application of Antiguan law, not Texas law.

These arguments fail to persuade.  To begin, the Texas Supreme Court, as well as several panels of the Texas Court of Appeals and this Court, apply

---

N, 3:10–CV–0931–N, 3:10–CV–1002–N, 2013 WL 2451738, at *2 (N.D. Tex. Jan. 22, 2013) [hereinafter *Janvey* Order].

[13] *Id.* at *4.

[14] *Id.* (citing *In re Mirant Corp.*, 675 F.3d 530, 537 n.3 (5th Cir. 2012)).

[15] *Id.* at *5.

the 'false conflicts' analysis. In *Duncan v. Cessna Aircraft Co.*,[16] the Texas Supreme Court engaged in a 'false conflicts' analysis rather than engaging in a full Second Restatement analysis. The *Duncan* court first identified the "policies or 'governmental interests,' if any, of each state in the application of its rule."[17] Concluding that "[a]n analysis of the relevant state contacts reveals that New Mexico has no underlying interest in the application of its law, while Texas has important interests," the *Duncan* court held that, in "this situation, known as a 'false conflict,' it is an established tenet of modern conflicts of law that the law of the interested state should apply."[18] Recent panels of the Texas Court of Appeals continue to apply the 'false conflicts' analysis. For example, in *Engine Components, Inc. v. A.E.R.O. Aviation Co.*,[19] a panel explained that "there may not be a conflict when only one forum has an interest at stake. This is referred to as a 'false conflict.'"[20] And we have also applied the 'false conflicts' analysis in Texas diversity cases. In *De Aguilar v. Boeing Co.*, we explained that, because "Mexico has no underlying interest in the application of its law . . . [and] Texas certainly has an interest," there was "a false conflict, and Texas law applies."[21]

To be sure, one panel of the Texas Court of Appeals held that, "[w]hile the 'False Conflicts' doctrine has important influence in the governmental policy analysis contained in the Second Restatement, we do not believe it should be used to determine whether a conflicts exists" because such use "may

---

[16] 665 S.W.2d 414, 421–22 (Tex. 1984).

[17] *Id.* at 421.

[18] *Id.* at 422.

[19] No. 04-10-00812-CV, 2012 WL 666648, at \*2 (Tex. App.—San Antonio 2012, pet. denied (mem. op.)).

[20] *Id.* (internal citation omitted).

[21] 47 F.3d 1404, 1414 (5th Cir. 1995).

very well supplant the Second Restatement as the test to determine the conflicts of law."[22]   As compelling as this reasoning may be, neither the Texas Supreme Court nor other panels of the Texas Court of Appeals have adopted this reasoning.   Accordingly, we hold that the district court did not err in applying a 'false conflicts' analysis.

Applied here, the 'false conflicts' analysis compels the conclusion that TUFTA applies to the Receiver's claims.  As prior opinions of this Court and the district court have made clear, the Stanford Ponzi scheme was centered in and operated out of Houston, Texas.  Although there were numerous Stanford entities, these entities were mere conduits by which Stanford and Davis carried out the Ponzi scheme.  The scheme's only connection to Antigua is that SIB was incorporated and ostensibly operated from there.   Beyond this, Antigua has no interest in the application of its law to this case; no Antiguan citizen has been identified as a defrauded investor, nor has the Receiver brought suit against an Antiguan citizen as a 'net winner' of the Ponzi scheme.[23]   In this regard, the Texas Supreme Court's decision in *Duncan* is informative.  There, the Texas Supreme Court concluded that New Mexico had no interest in the application of its law regarding releases of joint tortfeasors where "no New Mexico defendant or injured party is involved," even though the underlying plane crash occurred in New Mexico.[24] Here, similarly, Antigua has no interest in the application of its laws to the Stanford Ponzi scheme.

In contrast, Texas has a substantial interest in the application of its fraudulent transfer laws.  The Ponzi scheme was operated out of Texas, the

---

[22] *Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W.3d 302, 318–19 (Tex. App.—Texarkana 2004, no pet.).

[23] *See, e.g.*, *Janvey* Order, 2013 WL 2451738, at *4.

[24] *Duncan*, 665 S.W.2d at 418, 421.

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

Receiver is in Texas, many of the Stanford entities are in Texas, and some of the defrauded creditors and Net Winners are Texan.[25]  Thus, in sharp contrast to Antigua, Texas has a real interest in the application of its laws to the Receiver's fraudulent transfer actions.  Finally, as between Texas and other UFTA-enacting states, we find no conflict as to the provisions at issue here. The UFTA-enacting states have identical language governing the issues in this appeal.  Accordingly, we find no error in the district court's application of TUFTA to the Receiver's claims.

### III

We turn next to the investor-defendants' argument that the Receiver lacks standing to bring TUFTA claims.  We review questions of statutory standing de novo.[26]  Distilled to its essence, the investor-defendants' argument is that the Receiver lacks standing to bring TUFTA claims because only a debtor's creditors may bring fraudulent transfer claims.  Since "a federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors,"[27] the investor-defendants argue that the Receiver cannot bring the instant TUFTA claims.

The Receiver argues that he has standing to pursue TUFTA claims on behalf of the Stanford entities.  He explains that because the Ponzi scheme principals—Stanford and Davis—caused the Stanford entities to make fraudulent transfers that harmed the entities by dissipating their assets

---

[25] *See Janvey* Order, 2013 WL 2451738, at *2-3.

[26] *See Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 635 (5th Cir. 2012).  Although often clothed as an issue of subject-matter jurisdiction, the Supreme Court has made clear that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014) (emphasis in original) (internal quotation marks omitted).

[27] *Janvey v. DSCC*, 712 F.3d 185, 190 (5th Cir. 2013).

without receiving reasonably equivalent value in return, the Stanford principals are properly viewed as debtors under TUFTA, and the Stanford entities are the defrauded creditors under TUFTA.

We agree.  In *DSCC*, we explicitly held that "the Receiver has standing to assert the claims of [SIB], and any other Stanford entity in receivership, against the [investors] to recover the contributions made to them without reasonably equivalent value by the Stanford Ponzi operation."[28]    The "knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations."[29]    Because this knowledge is not imputed to the Stanford entities, "the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties without receiving reasonably equivalent value."[30]

The investor-defendants argue that the panel in *DSCC* mistakenly relied upon the Seventh Circuit's decision in *Scholes v. Lehmann*.[31]  To this end, they argue (i) that *Scholes* is not binding authority, and (ii) *Scholes* was addressing a fraudulent transfer claim under Illinois law that predated Illinois' adoption of UFTA.  This argument fails to persuade, as it is foreclosed by our prior decision in *DSCC*.[32]    Accordingly, we hold that the Receiver has standing to bring the TUFTA claims on behalf of the Stanford entities.

---

[28] *Id.* at 192.

[29] *Id.* at 190.

[30] *Id.*

[31] 56 F.3d 750 (7th Cir. 1995).

[32] *See Billiot v. Puckett*, 135 F.3d 311, 316 (5th Cir. 1998) ("As a general rule, one panel may not overrule the decision of a prior panel, right or wrong, in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court.").

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

## IV

The investor-defendants next argue that the Receiver's TUFTA claims are barred by the statute of limitations. Under TUFTA, an action seeking to void a fraudulent transfer must be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."[33] The investor-defendants argue (i) that Stanford himself knew or could have discovered the fraud he was perpetrating before the Receiver was appointed, and (ii) that the suits should have been brought within a year of the Receiver having been appointed on February 16, 2009.

To prevail on a limitations defense, the investor-defendants must present "evidence to show that the Receiver knew or could reasonably have known for more than one year prior to filing suit that the [transfers] were fraudulent conveyances that had been made during the operation of a Ponzi scheme and using funds from the Stanford corporations that were proceeds of that scheme."[34] We explained in *DSCC* that, "[b]ecause the Stanford corporations were the robotic tools of Stanford's Ponzi scheme, knowledge of the fraud could not be imputed to them while they were under Stanford's coercion."[35] Moreover, "upon the Receiver's appointment on February 16, 2009, it was not readily evident to him or to anyone not privy to the inner workings of the Stanford corporations that these entities were part of a massive Ponzi scheme perpetrated by Stanford beginning as early as 1999."[36] It was only on February 16, 2009, that the Receiver retained Van Tassel to

---

[33] Tex. Bus. & Com. Code § 24.010(a)(1).
[34] *DSCC*, 712 F.3d at 193.
[35] *Id.*
[36] *Id.* at 196.

12

analyze the books, and it was "not until August 27, 2009 that Davis pleaded guilty to federal securities-, mail-, and wire-fraud offenses and in connection therewith disclosed facts indicating the true nature and duration of Stanford's operation of a massive Ponzi scheme."[37]

As in *DSCC*, the two suits that the investor-defendants allege were filed too late—February 23 and May 18, 2010—were filed "less than one year after Davis's guilty plea."[38]   And the investor-defendants "have not introduced any evidence that tends to show that the Receiver knew or could reasonably have known about the true nature and duration of the Ponzi scheme for more than one year prior to the Receiver's filing of [these suits,] . . . or that the Receiver and Van Tassel did not search diligently to uncover evidence and knowledge of the Ponzi scheme[.]"[39]   Thus, the Receiver's TUFTA claims are not barred by the statute of limitations.

## V

## A

We turn now to the merits.  We review the district court's grant of summary judgment de novo, applying the same standards as the district court.[40]   TUFTA provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."[41]   Thus, "TUFTA requires that the debtor *transferor* make the transfer 'with actual intent to . . . defraud any creditor of the

---

[37] *Id.* at 197.

[38] *Id.*

[39] *Id.* at 197–98.

[40] *See, e.g., Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012) (citing *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163 (5th Cir. 2006)).

[41] Tex. Bus. & Com. Code § 24.005(a)(1).

debtor.'"[42]　"In this circuit, proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."[43]　This is because "'the transferees' knowing participation is irrelevant under the statute' for purposes of establishing the premise of (as opposed to liability for) a fraudulent transfer[;]" instead, the "statute requires only a finding of fraudulent intent on the part of the 'debtor[.]'"[44]

It is well-established that the Stanford principles—Stanford and Davis— were operating a Ponzi scheme.  In both *DSCC* and *Alguire*, we explained that Stanford "created and perpetrated a 'Ponzi scheme.'"[45]　We noted that Davis' Plea "reflects a classic Ponzi scheme," and that the "Van Tassel Declarations also provide clear, numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme[.]"[46]　The investor-defendants argue that the Van Tassel Declarations are controverted by the Stanford entities' accounting records that reflects that they remained solvent, but these accounting records are rendered incredible by Davis' admission that the "continued routine false reporting . . . upon which CD investors routinely relied in making their investment decisions, in effect, created an ever-widening hole between reported assets and actual liabilities, causing the creation of a massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds."[47]

---

[42] *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011) (alteration and emphasis in original) (quoting Tex. Bus. & Com. Code § 24.005(a)(1)).

[43] *Id.* (alteration in original) (quoting *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)).

[44] *Res. Dev. Int'l, LLC*, 487 F.3d at 301 (quoting *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006)).

[45] *DSCC*, 712 F.3d 185, 188 (5th Cir. 2013).

[46] *Alguire*, 647 F.3d at 597.

[47] *Id.* (alteration in original) (quoting Davis's plea).

Indeed, Davis made clear that the Stanford entities' records were unreliable since 1988 when "Stanford directed Davis to 'make false entries into the general ledger for the purpose of reporting false revenues and false investment portfolio balances to the banking regulators' shortly after opening Guardian International Bank, as SIB was then known, in Montserrat."[48]

The investor-defendants argue that it was permissible for SIB to prefer one creditor over another. In this regard, they argue TUFTA does not give rise to a claim merely because all creditors do not receive the same value. This argument misses the mark. It is well-established that the Stanford principles operated the Stanford entities as a Ponzi scheme, and the existence of the Ponzi scheme establishes fraudulent intent. In other words, this is not the case of an innocent debtor preferring one creditor over another; instead, this was an insolvent Ponzi scheme perpetuated by paying old investors with new investors' investments. We agree with the district court that the Receiver established that the Stanford principles transferred monies to the investor-defendants with fraudulent intent.

**B**

That transfers were made with fraudulent intent does not end the inquiry, as TUFTA provides that a "transfer or obligation is not voidable . . . against a person who took in good faith and for a reasonably equivalent value."[49] Under TUFTA, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer . . . an antecedent debt is secured or satisfied[.]"[50]

---

[48] *Id.* (quoting Davis's plea).

[49] Tex. Bus. & Com. Code § 24.009(a).

[50] *Id.* § 24.004(a).

15

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

TUFTA defines debt as "a liability on a claim,"[51] and a claim as "a right to payment or property[.]"[52]

Here, the investor-defendants argue that the payment of interest to them is a reduction of antecedent contractual debt that they are owed by SIB on the CDs that they purchased. In their view, it is one thing to say that an investor should not get to keep the distribution of profit when there is no profit and any reported profits are fictitious, but it is entirely different to say that an investor should not be permitted to keep his contractually guaranteed interest payments. In support of this position, the investor-defendants rely chiefly on *In re Carrozzella & Richardson*,[53] where a district court held that contracts with Ponzi schemes for payments of reasonable interest are enforceable and payments made on them are for reasonably equivalent value. In *Carrozzella & Richardson*, a law firm ran a Ponzi scheme wherein it "solicited investors to deposit funds with it in exchange for a promised annual rate of return between 8% and 15%."[54] The firm "commingled the funds placed with it by a given investor with funds deposited by other investors and other entities, as well as the general revenue of the legal practice of [the firm.]"[55] The early investors received a return of their principal plus interest, whereas later investors lost virtually all of their principal investments. An involuntary petition for relief under Chapter 7 was filed against the law firm, and a Trustee was appointed. The Trustee then sought to recover all interest payments made to the earlier investors under Connecticut's UFTA. The district court held that the

---

[51] *Id.* § 24.002(5).
[52] *Id.* § 24.002(3).
[53] 286 B.R. 480 (D. Conn. 2002).
[54] *Id.* at 483-84.
[55] *Id.* at 484.

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

payments were for reasonably equivalent value.  It explained that "the proper focus is the contractual relationship between the investor and the debtor and the *quid pro quo* thereunder."[56]  And in the case of interest payments, "the debtor's use of the investor's funds for a period of time supported the payment of reasonable contractual interest[.]"[57]  Thus, since in "exchange for the interest paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a contractual debt[,]" "[t]his satisfaction of an antecedent debt is 'value' . . . and in this case 'reasonably equivalent value.'"[58]  Importantly, the court noted that to "the extent that these Defendants had not been paid the interest owed, they would have been creditors of the Debtor's bankruptcy estate, asserting claims for unpaid interest."[59]

Here, the district court rejected this argument, holding that the investor-defendants failed to provide any value for the interest payments that they received because the only claim that they have for their interest payments is a contractual one, which the district court held is unenforceable.  In contrast, the district court held that the investor-defendants did give reasonably equivalent value to the extent that they received back their principal because they have actionable claims for fraud and restitution.  The district court noted that this leads to an equitable result, because "for victims of a Ponzi scheme, everyone is a loser. . . .  Allowing Net Winners to keep their fraudulent above-market returns in addition to their principal would simply further victimize the true Stanford victims, whose money paid the fraudulent interest."[60]

---

[56] *Id.* at 487.
[57] *Id.* at 489.
[58] *Id.* at 491.
[59] *Id.*
[60] *Janvey* Order, 2013 WL 2451738, at *10.

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

We agree with the district court. There are two competing approaches to fraudulent transfer claims arising from contractual interest payments in Ponzi schemes. First, some courts have held that contracts, like the CDs at issue here, are either void and create "no legal entitlement to profits or interest," or are in actuality "investment contracts as opposed to loans," because parties invest in such vehicles "with the hope of reaping a profit rather than providing a loan with an entitlement to some kind of return."[61] Yet, as the investor-defendants note, some courts have followed the *Carrozzella & Richardson* reasoning, holding that in the case of interest payments, "the debtor's use of the investor's funds for a period of time support[s] the payment of reasonable contractual interest[.]"[62]

Although the *Carrozzella & Richardson* reasoning has some force, we find permitting clawback of interest payments made by Ponzi schemes—the approach taken by the district court—to be more persuasive. The *Carrozzella & Richardson* approach depends on there being a 'debt' that the interest payments are reducing. Because TUFTA defines a 'debt' as being a "liability on a claim," the investor-defendants must have a valid claim. Here, we conclude that there is no valid claim for interest; the CDs issued by SIB are void and unenforceable.[63] This is because "[t]o allow an [investor] to enforce

---

[61] *Warfield v. Carnie*, No. 3:04-cv-633-R, 2007 WL 1112591, at *1213 (N.D. Tex. Apr. 13, 2007); *see also In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1286, 1290 (10th Cir. 1996); *In re Taubman*, 160 B.R. 964, 985-86 (Bankr. S.D. Ohio 1993); *In re Indep. Clearing House Co.*, 77 B.R. 843, 857-58 (D. Utah 1987) (en banc).

[62] *Carrozzella & Richardson*, 286 B.R. at 489.

[63] *See, e.g., Warfield*, 2007 WL 1112591, at *12; *see also Fairfield Ins. Co. v. Stephens Martin Paving, L.P.*, 246 S.W.3d 653, 663 (Tex. 2008) ("In the absence of expressed direction from the Legislature, whether a promise or agreement will be unenforceable on public policy grounds will be determined by weighing the interest in enforcing agreement versus the public policy interest against such enforcement.").

his contract to recover promised returns in excess of his undertaking would be to further the debtors' fraudulent scheme as the expense of other [investors]."[64] And "any recovery would not come from the debtors' own assets because they had no assets they could legitimately call their own.  Rather, any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme."[65]  Thus, because the investor "had no claim against [the entity engaged in the Ponzi scheme] for damages in excess of her original investment, [that entity] had no debt to her for those amounts. Therefore, the transfers could not have satisfied an antecedent debt of [the entity,] which means [the entity] received no value in exchange for the transfers."[66]  To be sure, courts often permit innocent plaintiffs to enforce contracts  that are against public policy, but here, such "enforcement would further none of the policies generally favoring enforcement by an innocent party to an illegal bargain. . . . [A]ny award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme."[67]

Moreover, this approach comports with our decision in *Warfield v. Byron*.[68]  There, we explained that "[t]he primary consideration in analyzing the exchange for value for any transfer is the degree to which the transferor's

---

[64] *Taubman*, 160 B.R. at 985 (quoting *Indep. Clearing House*, 77 B.R. at 858).

[65] *Hedged-Invs. Assocs., Inc.*, 84 F.3d at 1290 (quoting *Indep. Clearing House*, 77 B.R. at 858). Although the Tenth Circuit case addresses the bankruptcy code, we have recognized that the provision of the UFTA at issue here "is 'virtually identical' to the corresponding provision of the Bankruptcy Code[.]" *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

[66] *Hedged-Invs. Assocs., Inc.*, 84 F.3d at 1290.

[67] *Indep. Clearing House*, 77 B.R. at 858; *see also In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991) ("We recognize that if the [interest] payments are not set aside, earlier investors who received these payments will enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky.").

[68] 436 F.3d 551 (5th Cir. 2006).

net worth is preserved."[69]  The focus on the transferor's net worth is important because, as the Seventh Circuit noted in *Scholes v. Lehmann*, "creditors are not . . . defrauded if all that happens is the exchange of an existing asset of the debtor for a different asset of equal value."[70]   In *Warfield*, a receiver was appointed to recover assets from a Ponzi scheme, and was authorized to sue individuals to recoup receivership assets.[71]   The receiver sued an investor—who had received assets from the Ponzi scheme—under Washington's UFTA. The investor sought to avoid repayment, arguing that he received the assets in exchange for reasonably equivalent value, his brokerage services.[72]   We rejected this argument, explaining that "[i]t takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments."[73]

Here too, SIB received no benefit or preservation of wealth from the payment of interest to the investor-defendants; indeed, SIB was insolvent and remained insolvent during the Ponzi scheme.  Each payment of "interest" only worsened this insolvency because each payment was made using a later investor's deposit.  Thus, from the perspective of the transferor, each interest payment decreased net worth, and because the investor-defendants have no claim for contractual interest from a Ponzi scheme, the transferor received nothing of value that preserved its net worth.  Accordingly, we conclude that

---

[69] *Id.* at 560 (citing *Butler Aviation Int'l v. Whyte*, 6 F.3d 1119, 1127 (5th Cir. 1993)).

[70] 56 F.3d 750, 753 (7th Cir. 1995).

[71] 436 F.3d at 554.

[72] *Id.* at 560.

[73] *Id.  See also Taubman*, 160 B.R. at 986 ("If the use of the defendants' money was of value to the debtors, it was only because it allowed them to defraud more people of more money.  Judged from any but the subjective viewpoint of the perpetrators of the scheme, the 'value' of using others' money for such a purpose is negative.").

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

the district court did not err in granting partial summary judgment to the Receiver.

The investor-defendants argue that this result is in tension with our opinion in *Janvey v. Adams*.[74] This argument also misses the mark; *Janvey v. Adams* only held that the "debtor-creditor relationship between" the defendants and SIB "constitutes a sufficient legitimate ownership interest to preclude treating the Investor Defendants as relief defendants."[75] We did not address the application of TUFTA nor in any way address the merits of the fraudulent transfer claims.

Finally, we agree with the district court that principal payments made to the investor-defendants are not subject to TUFTA claims. Unlike interest payments, it is undisputed that the principal payments were payments of an antecedent debt, namely fraud claims that the investor-defendants have as victims of the Stanford Ponzi scheme.[76]

## VI

Some of the investor-defendants seek to shelter net winnings as assets in IRA accounts exempted by Texas Property Code § 42.0021(a). As we recently explained, to claim this exception, a defendant "must establish that she has a legal right to the funds in the IRA."[77] The investor- defendants have offered no evidence to the district court that they have a legal right to the funds despite those funds being the product of a fraudulent transfer. The district court did not err in denying this exemption.

---

[74] 588 F.3d 831 (5th Cir. 2009).

[75] *Id.* at 835.

[76] *See, e.g.*, *Hedged-Invs. Assocs., Inc.*, 84 F.3d at 1290 (recognizing that Ponzi scheme victims have claims for damages in the amount of their original investment).

[77] *Alguire*, 647 F.3d at 601 (citing *Jones v. Am. Airlines, Inc.*, 131 S.W.3d 261, 270 (Tex.App.—Fort Worth 2004, no pet.)).

No. 13-10266 c/w 13-10272
c/w 13-10276 c/w 13-10279

**VII**

Finally, we decline to reach the investor-defendants' argument that certain factual issues remain as to whether the Magness defendants received net profits from their investments. As the Receiver points out, the investor-defendants did not raise this argument to the district court in its briefing on the motion for partial summary judgment, but instead raised in a currently stayed cross-motion for summary judgment, filed one year after briefing on the Receiver's motion was completed. The Magness motion for summary judgment has been stayed by the district court and, as this is an interlocutory appeal of the district court's grant of the Receiver's motion for partial summary judgment, reaching this issue would be premature.

For these reasons, we AFFIRM.